United States District Court
Middle District of Florida
Jacksonville Division

**MICHAEL LLOYD GREENE,**

　　　　*Plaintiff,*

v.                                                                **NO. 3:13-cv-1021-J-32PDB**

**SAIA MOTOR FREIGHT LINE, LLC,**

　　　　*Defendant.*

---

# Report and Recommendation

Michael Lloyd Greene alleges SAIA Motor Freight Line, LLC (SAIA), fired him because his wife is disabled, she required expensive treatment covered by SAIA's self-funded healthcare benefit plan, and he had to take time off to care for her. Doc. 1. He brings claims for association discrimination under the Americans with Disabilities Act (ADA), interference with rights under the Employee Retirement Income Security Act (ERISA), and retaliation for exercising rights under the Family and Medical Leave Act (FMLA). Doc. 1. SAIA moves for summary judgment; he opposes summary judgment. Doc. 40 (motion); Doc. 52 (response); Doc. 55 (reply); Doc. 56 (surreply).

I.      **Evidence**[1]

SAIA is a trucking company with approximately 8,500 employees nationwide.
Doc. 1 ¶ 5; Doc. 6 ¶ 5; Doc. 44-1 at 37–38; Doc. 49-1 at 13; Doc. 50-1 at 4. As of June
2014, its Eastern Division, made up of 78 terminals in 18 states, employed
approximately 4,557 employees, with 392 in Florida and 97 in Jacksonville. Doc. 25-
2 ¶ 9; Doc. 51-1 at 10–11.

Greene worked for SAIA from 1999 to 2013, mostly as a full-time line-haul
truck driver. Doc. 1 ¶¶ 8, 9; Doc. 6 ¶¶ 8, 9; Doc. 43-1 at 33–34, 39–40. His most recent
job entailed driving an 18-wheeler from Jacksonville to Crestview, Florida, and back.
Doc. 43-1 at 41–42. He reported to Ronald Moore (SAIA's Terminal Manager in
Jacksonville) and, in his absence, to James Whitehead (SAIA's Terminal Operations
Manager in Jacksonville) or James Scoggins (SAIA's Regional Human Resources

---

[1]SAIA relies on a declaration, depositions, and deposition exhibits. Doc. 41-1
(Marty Ready's declaration); Docs. 41-2−41-6 (Greene's deposition with exhibits 4, 10,
24, 25, 26, and 37); Doc. 41-7 (James McDonald's deposition); Doc. 41-8 (Ronald
Moore's deposition); Doc. 41-9 (James Scoggins's deposition with exhibits 2, 4, 5, and
8); Doc. 41-10 (James Whitehead's deposition); Doc. 41-11 (Devin Jenkins's deposition
with exhibit 1); Doc. 41-12 (Ready's deposition); Doc. 41-13 (Kristy Roger's
deposition); Doc. 41-14 (Deborah Brennan's deposition with exhibit 6).

Greene relies on the same depositions and a deposition of his wife, some of the
same deposition exhibits, and some additional deposition exhibits. Doc. 42-1
(Brennan's deposition with exhibits 1, 2, 3, 4, 5, and 6); Doc. 43-1−43-3 (Greene's
deposition); Doc. 44-1 (Ready's deposition); Doc. 45-1 (Roger's deposition); Doc. 46-1
(Whitehead's deposition); Doc. 47-1 (Jenkins's deposition); Doc. 48-1 (Marsha
Greene's deposition); Doc. 49-1 (Moore's deposition); Doc. 50-1 (Scoggins's deposition
with exhibit 2); Doc. 51-1 (McDonald's deposition).

There are four deposition transcript pages on each CM/ECF document page.
Except for deposition exhibits, this report and recommendation cites the page
numbers on the transcript pages.

Manager), all of whom had been with SAIA for most of his employment. Doc. 43-1 at 45–47; Doc. 46-1 at 6; Doc. 49-1 at 4; Doc. 50-1 at 5, 20–21. He was a satisfactory employee not known to cause trouble. Doc. 49-1 at 4–5; Doc. 50-1 at 5–6. While employed, he never complained to SAIA management about any poor treatment. Doc. 43-1 at 52–53.

SAIA offers employees an ERISA-governed, self-funded healthcare benefit plan under which an employee with at least 10 years of service makes no contribution for benefits for himself or his dependents (but remains responsible for deductibles, copays, and coinsurance). Doc. 43-1 at 92–94; Doc. 44-1 at 9–10; Doc. 45-1 at 22. SAIA distributes bonuses to supervisors based on SAIA's "achievement of company goals" or "bottom line." Doc. 44-1 at 28–29; Doc. 49-1 at 34. Because health insurance is a significant cost to SAIA, its cost "affects everyone's bottom line." Doc. 44-1 at 29.

The plan's third-party administrator, United Healthcare, maintains records about amounts SAIA pays for claims. Doc. 25-2 ¶ 6. Kristy Roger (SAIA's Corporate Benefits Manager in Louisiana) and employees in her department are the only ones with access to United Healthcare's system. Doc. 45-1 at 11; Doc. 50-1 at 25. She routinely provides her supervisor, Marty Ready (SAIA's Vice President of Human Resources in Georgia) with information on single claims over $20,000 so he can plan the budget. Doc. 41-1 ¶¶ 6, 7; Doc. 44-1 at 25–26; Doc. 45-1 at 6, 12. The information may include a claimant's name but not personal health information. Doc. 41-1 ¶ 6; Doc. 44-1 at 27; Doc. 45-1 at 12–13. He does not have access to United Healthcare's system. Doc. 44-1 at 12–13; Doc. 45-1 at 11.

As an employee with over ten years of service, Greene received healthcare coverage for himself and his wife, Marsha Greene, under the plan without having to pay premiums. Doc. 43-1 at 92–94. For her, Medicare covered what the plan did not. Doc. 48-1 at 18–20. She learned at a young age she suffers from polycystic kidney disease. Doc. 48-1 at 45. Since Greene's hiring in 1999, everyone "from human resources on down" knew she had health problems because it took time to get her coverage. Doc. 43-1 at 178.

In June 2010, Mrs. Greene suffered renal failure, requiring dialysis treatments three times a week. Doc. 43-1 at 18–19, 73–76; Doc. 43-3 at 246–48; Doc. 48-1 at 17–18, 45. Later that year, her lung collapsed and she suffered atrial fibrillations. Doc. 43-1 at 51–52. Greene gave an FMLA request form to Scoggins in case he needed to leave on an emergency basis. Doc. 41-6 at 11–13; Doc. 43-1 at 69–76, 78–79, 87–88; Doc. 43-3 at 245–46; Doc. 50-1 at 57–59. SAIA granted the request, allowing him to take leave for her emergencies. Doc. 43-1 at 70–76. He communicated with Moore and Scoggins when he had to miss work to care for her. Doc. 43-1 at 49–52.

Greene often talked about his wife's condition at work. Doc. 43-1 at 122; Doc. 49-1 at 24–25. Moore took him "under his wing," explaining his own wife is a nurse and he understood polycystic kidney disease. [2] Doc. 43-1 at 124–28, 180; Doc. 49-1 at 40. Greene often talked to Moore "about the price of medicine and the various procedures … the collapsed lung and everything." Doc. 43-1 at 121–30; Doc. 43-3 at

---

[2]Moore did not recall discussing Mrs. Greene's condition with his wife. Doc. 49-1 at 41. He testified his wife works as a registered nurse at an extended care home and has no specialized knowledge of kidney ailments. Doc. 49-1 at 40–43.

249. Moore and Scoggins often asked how she was doing. Doc. 43-1 at 128; Doc. 50-1 at 11, 57.

Two years after Mrs. Greene went into renal failure, on October 1, 2012, she underwent a kidney transplant. Doc. 43-1 at 18–19; Doc. 48-1 at 41. Greene expressed his excitement to Moore, Doc. 49-1 at 30, and used about a month of personal leave and vacation time to help her. Doc. 43-1 at 71–73; Doc. 43-3 at 247–48; Doc. 49-1 at 30–31. After the transplant, she had follow-up appointments and had to take anti-rejection medications. Doc. 43-3 at 233–35; Doc. 48-1 at 23, 39–45. Scoggins gave Greene another FMLA request form, but Greene did not complete it and does not remember designating any of the time as FMLA leave, believing any time off after his 2010 approval was automatically FMLA leave. Doc. 43-1 at 72–73, 79–81; Doc. 43-3 at 247–48. SAIA never denied leave, disciplined him for missing work, or commented about any time off. Doc. 43-1 at 76, 84; Doc. 43-3 at 257.

The only record evidence regarding medical bills for Mrs. Greene was Roger's confirmation they exceeded $200,000 in 2012, Doc. 45-1 at 9–10 (referenced elsewhere as $226,385, Doc. 43-3 at 274), Greene's testimony that her dialysis treatments cost thousands of dollars each, Doc. 43-3 at 235, Greene's testimony that her medications cost more than $1000 a month, Doc. 43-3 at 235–36, 248–49, Greene's testimony that she requires a yearly biopsy that is "not cheap," Doc. 43-3 at 233–24, and Greene's testimony that both the transplant and the dialysis treatments were very expensive, Doc. 43-3 at 235.[3] Greene did not know if her healthcare for 2012 (when she

_____

[3]Greene testified that the transplant was "horribly expensive … a $500,000 bill

underwent the kidney transplant) was more expensive than her healthcare for 2011 (when she was receiving thrice weekly dialysis treatments) but implied the years were comparable because "dialysis is exceedingly expensive." Doc. 43-3 at 275. Greene had no issues with coverage or claims paid through the plan. Doc. 43-1 at 102−03. When he had questions, he contacted United Healthcare. Doc. 43-1 at 102−03.

Due to the large number of emails he receives daily and the routine nature of emails informing him of claims of $20,000, Ready could not recall if he had received any such email concerning Mrs. Greene. Doc. 41-1 ¶ 7. He never discussed with anyone Mrs. Greene, her health, her medical treatment, her healthcare costs, or the costs to SAIA of her treatment. Doc. 41-1 ¶¶ 5, 6.

In early 2013, Greene had two run-ins with Devin Jenkins, a security guard with an outside company (Imperial Security) serving the Jacksonville terminal. Doc. 43-1 at 131−32; Doc. 47-1 at 23; Doc. 49-1 at 4−5; Doc. 50-1 at 6. One night in January, Greene arrived at the terminal to find Jenkins absent from his post to open the gate[4] and the chain on the gate too tight and backwards, making it tough to open. Doc. 43-1 at 131−32, 134. He found Jenkins asleep in his car and told him he could use his help, to which Jenkins responded it was not his problem and he did not care. Doc. 43-1 at 134−37; Doc. 47-1 at 22−28. The men engaged in "a little verbal thing," with Greene saying his problem was his absence from the front gate, Jenkins repeating he

---

or something," Doc. 43-1 at 179−80, and that the transplant, if "not mistaken, was 500,000," Doc. 43-3 at 237, but he uses the $200,000 figure in his response in opposition to summary judgment, Doc. 52 at 1, 2, 10.

[4]Jenkins contends that, due to a change in procedure, he was not required to stay at the gate to unlock it. Doc. 47-1 at 24−27, 40, 71, 93.

did not care, and Greene saying, "I know and that's the GD problem." Doc. 43-1 at 137. Greene walked away and reported him to the security supervisor. Doc. 43-1 at 137–38. The next weekend, Greene saw him standing in the shadows staring at him and found it "a little unnerving." Doc. 43-1 at 146–47, 171.

Two weeks after the initial verbal altercation, on Saturday, February 9, the situation escalated to fisticuffs. Doc. 43-1 at 142–43, 147–48. Greene arrived at the terminal that night, saw no guard, and went to the back of the yard to complete his post-trip procedures. Doc. 43-1 at 164. As he was finishing his procedures outside the truck,[5] Jenkins approached to collect Greene's paperwork.[6] Doc. 43-1 at 149, 164–66; Doc. 47-1 at 35–37. As Greene handed him the paperwork, Greene told him something to the effect of, "Hey, I didn't see you up front." Doc. 43-1 at 151. Jenkins, who was unhappy with Greene for not locking the gate after entering the terminal (causing Jenkins to do more work) and who knew he was about to be laid off because Imperial Security's contract was ending, screamed and repeated, "It's not my F-ing job." Doc. 43-1 at 53, 152; Doc. 47-1 at 53, 82. Jenkins clenched his fist and lunged toward Greene,[7] and Greene hit him twice.[8] Doc. 43-1 at 147–48, 152, 165; Doc. 47-1 at 46,

---

[5]Jenkins claims Greene was inside his truck when he approached to collect the paperwork. Doc. 47-1 at 84–86.

[6]Drivers are supposed to provide paperwork to the guard on duty when finished with a job to ensure the load had not been compromised and they had pulled the right trailer. Doc. 51-1 at 73–74, 77–78. The guard validates the information and records it in a log. Doc. 51-1 at 74–75.

[7]Jenkins denies lunging and cussing. Doc. 47-1 at 45, 50–51.

[8]According to Jenkins, Greene hit him once and tried to hit him a second time but did not succeed. Doc. 41-11 at 32, 92; Doc. 47-1 at 46.

59−60, 79−84, 104. The men fell to the ground fighting, with Greene placing Jenkins in a choke hold and Jenkins "punching away," until, at Jenkins's request, the men agreed to stop. Doc. 43-1 at 152−53; Doc. 47-1 at 46−47. Greene explained: "[Jenkins] wanted me to let him out of the chokehold. And he said if I didn't he was going to beat the shit out of me. I didn't see how that was going to happen, but that's what he said. And I said, All right. So we stopped, and he immediately called the police." Doc. 43-1 at 153; Doc. 47-1 at 41.[9]

Two police officers responded, but neither Greene nor Jenkins pressed charges.[10] Doc. 41-6 at 15; Doc. 43-1 at 155−56, 158; Doc. 43-3 at 261; Doc. 47-1 at 51.

---

[9]This was not Jenkins's only fight while working as a security guard—he fought with a guest at a motel after the incident with Greene. Doc. 47-1 at 47–48, 105–108.

[10]The police report states:

Jenkins told Ofc. Hopely that he and Mr. Greene got into an argument about who was supposed to open the entrance gate at the business. Jenkins said that Mr. Greene shoved him on his back during the argument. Jenkins said he acted in "self-defense" and he punched Mr. Greene several times after he was shoved. Jenkins said "we fussled a little bit and went to the ground. I hit him a few more times to get him off me and that was it." Ofc. Hopely did not observe any visible sign of injury present on Jenkins.

I met with Mr. Greene nearby. Mr. Greene advised he has been having issues with Mr. Jenkins not doing his job for sometime now. Mr. Greene advised when he arrived at the terminal Mr. Jenkins was not at the security gate. Mr. Greene proceeded into the terminal and went to the back lot to disconnect the trailer. While disconnecting the trailer, Mr. Jenkins arrived. Mr. Greene advised he told Mr. Jenkins he needed to do his job and be at the gate. Mr. Greene advised Mr. Jenkins got extremely angry and got in [his] face screaming profanity and racial slurs at him. Mr. Jenkins then balled his fist up next to his waist and lunged at Mr. Greene. Mr. Greene advised he felt threatened and swung at Mr. Jenkins twice. The two then engaged in a fight on the ground where several more "swings" were thrown by both parties. When the two

Greene explained, "I didn't want [Jenkins] to lose his job. I just figured let's just let this thing go. And it wasn't professional for him, it wasn't professional for me; it was just one of those darn things." Doc. 43-1 at 155−56. Jenkins explained, "[T]he officer on site advised that if one of us … pressed charges, if the other one pressed charges, we would both be prosecuted. So I didn't want that and he didn't want that. So we just let it go." Doc. 47-1 at 51.

Jenkins also called his supervisor, who left his home and went to the terminal to talk to him. Doc. 47-1 at 41−42. That night, Whitehead reported the incident to James McDonald (SAIA's Eastern Division Security Coordinator in Georgia), who called the police to find out what had happened. Doc. 43-3 at 253; Doc. 49-1 at 20−21; Doc. 50-1 at 48; Doc. 51-1 at 56−61. McDonald also called Greene to inform him he was out of service pending further investigation and should report to the terminal at 8:00 Monday morning to provide a statement and be interviewed, and Scoggins to let him know what had happened and that Greene would come in Monday morning. Doc. 41-9 at 27; Doc. 43-1 at 158−59; Doc. 48-1 at 55−56; Doc. 50-1 at 48; Doc. 51-1 at 56−61. Greene knew he would be "coming in for a dressing down" and thought he might be disciplined because the fight was "unprofessional conduct" but did not think he would lose his job. Doc. 43-1 at 160–61.

SAIA's employee manual lists "[f]ighting on Company or customer property

---

separated, Mr. Jenkins called for police services and both parties contacted their employers. Mr. Greene's lip was bleeding and both eyes were bruised but he refused rescue at the scene.

Doc. 41-6 at 15.

while on duty" as an action that "may, in [SAIA's] sole judgment[,] warrant summary termination of employment." Doc. 41-5 at 18. In a "Violence in the Workplace" section, the manual explains SAIA "is committed to providing a work environment that is free from acts of violence and threats in order to insure [sic] the health and safety of all employees," "[a]cts or threats of violence will not be tolerated," an employee who feels subjected to acts or threats of violence should "immediately report the incident to their terminal manager, department head, or the Human Resources Department" for investigation, the Human Resources Department will investigate reports of violence, and "[a]ny acts of violence or threats will result in disciplinary action up to and including termination." Doc. 41-6 at 8. The section includes an 800-number to use. Doc. 41-6 at 8. Every time SAIA has addressed a physical altercation, it has fired both people involved.[11] Doc. 44-1 at 24. Ready estimates that SAIA has addressed 10 such situations in the last 2 years. Doc. 44-1 at 23.

The next day, on Sunday, February 10, after obtaining the police report, McDonald sent a "high importance" email to Scoggins, Ready, and others (with copies to Moore and Whitehead) regarding the "JAX Saturday Incident." Doc. 41-9 at 27. He reported:

> There was a verbal and physical altercation between driver Mike Greene and an Imperial guard. Mr. Greene sustained a busted lip which will probably require stiches and some bruising underneath his eyes. The guard and Mr. Greene have had an ongoing feud regarding the opening

---

[11]Greene testified he had heard stories about Whitehead having gotten into a fight with a line-haul driver in the break room just before Greene was hired. Doc. 43-1 at 182−83. In his deposition, Whitehead explained he had gotten into a verbal—not physical—altercation with an out-of-town truck driver in the break room in 2001. Doc. 46-1 at 16−20, 30–31.

of the gate for some time according to the responding officer. The incident tonight apparently started in the back of the terminal as a verbal altercation between Mr. Greene and the guard. The officer indicated Mr. Greene felt threatened when the guard made one of his hands into a fist. Mr. Greene then allegedly threw the first punch. Both m[e]n continued to fight and eventually ended up on the ground. The guard did not sustain any injuries from what I've been told. The police did not make an arrest due to no independent witnesses or video.

I've placed Mr. Greene out of service pending further investigation and instructed him to report to the terminal Monday morning at 08:00 AM to be interviewed and provide a written statement. Imperial suspended the guard and had another officer relieve his post. I also instructed Imperial not to bring the officer back in the future. We have 9 days left until the transition to Weiser security.

Doc. 41-9 at 27.

On Monday morning, February 11, Moore and Scoggins interviewed Greene

and obtained a statement from him.[12] Doc. 41-6 at 18; Doc. 43-1 at 167−68; Doc. 49-1

---

[12]Greene provided the following statement:

(1) I arrived [at] yard around 9:30 I think.

(2) I opened the gate, drove thru and locked it back. I didn't see the guard so I proceeded to the back of yard to do a post trip + break down of pups.

(3) The guard drove up as I was finishing up the post trip + breakdown. I turned and saw him with the clip board so I walked to the cab of my truck, step up to get my bills.

(4) He yelled @ me to give him paperwork before I left. I already had the bills in my hand to give him so I climbed off the steps, took about 2 or 3 steps in his direction to give him the bills.

(5) The only thing I said to him in a nice way was to say that when I came up I didn't see anybody which was just my way of explaining why I was in the back of yard.

(6) at this time he approached me with clenched fist wide eyes veins sticking out of neck obviously enraged and screamed it wasn't his job!

(7) I was then attacked & I defended myself as best I could do.

(8) Diagram …

at 5, 19–20. Greene recalls they were nice and that Moore told him the fight was self-defense and that he had a right to defend himself.[13] Doc. 43-1 at 156, 167–68; Doc. 43-3 at 250–51. That is when Greene "felt maybe [he wouldn't] get fired." Doc. 43-1 at 167.

The next morning, on Tuesday, February 12, McDonald, Scoggins, and Curtis McClain (Imperial Security's Regional Trainer) interviewed Greene by phone. Doc. 1 ¶ 27; Doc. 43-3 at 251–52; Doc. 50-1 at 52, 55–56; Doc. 51-1 at 22–23, 27, 65. They also interviewed Jenkins by phone. Doc. 50-1 at 52; Doc. 51-1 at 22. He told them Greene had cursed at him and hit him first. Doc. 41-9 at 26; Doc. 41-11 at 32; Doc. 47-1 at 55. McDonald and Scoggins also obtained a statement from Jenkins[14] and

---

I had no where to go.

Doc. 41-6 at 18.

[13]Moore denies making any statement about self-defense. Doc. 49-1 at 21–22. In Greene's response to SAIA's motion for summary judgment, he alleges that Scoggins also told him his actions were self-defense, Doc. 52 at 10, but there is no record to support that asserted fact. In his deposition, Greene testified he could not remember what Scoggins had told him. Doc. 43-1 at 168. Scoggins did not recall anyone telling Greene his actions were self-defense. Doc. 50-1 at 11–12.

[14]Jenkins provided the following statement:

I observed driver go into the back lot without checking in first. I the[n] proceeded to drive over to take down the driver's information. I asked for the paperwork and started to write down the tra[c]tor number when the driver said "Why aren't you at the gate." I replied "It not my job to be at the Gate. I told you this before" referring to the Saturday three weekends ago when my supervisor talked to him about this. He then went on in a louder tone of voice "It is your damn job to be at the Gate" and step[p]ed forward towards me. I said "It's not my damn job to be at the Gate" he then hit me in the face. And then tried to hit me a second time that's when I hit him twice. Then we both went to the Ground. While on the Ground I told him to let me go he refused so I hit him twice again. As we are both getting up he still seems ready to fight so I toss him back to the ground. As he getting back up he says "Im to[o] old for

12

reviewed Greene's work history. Doc. 50-1 at 49–52; Doc. 51-1 at 22, 25–27.

After the interviews, Scoggins emailed his supervisor, Deborah Brennan (SAIA's Human Resources Director in Georgia) (with copies to McDonald, Ready, and himself) a summary of his investigation and a termination recommendation:

> On February 9, 2013 Mike Greene arrived at the JAX yard and got into a physical confrontation with a contract security guard on the JAX yard. I was notified of this incident on Sunday February 10, 2013 by James Mcdonald Saia Security Manager. On Monday morning February 11, 2013 I met with Ronnie Moore and Michael Greene in Ronnie's office to interview Mike and get his written statement. Ronnie and I both ask Michael what happened and to give us the recap of how this all transpired including the history with the guard in question leading up to the physical altercation. On Tuesday February 12, 2013 a phone interview was held with James Mcdonald, Curtis, Mike Greene and myself to review the incident, immediately after this call the interviewees got on another call and interviewed the security guard Mr. Jenkins. The stories of the two individuals did not exactly match and I felt the truth was somewhere in the middle between both parties involved. Upon review of the written statements and the phone interviews with the parties involved I feel that Mr. Greene had options that could have prevented the physical altercation. His fear he stated of the guard could have been addressed with Saia leadership as could his issues in the past leading up to this with his local manager. Mr. Greene could have also stayed in his truck when the guard approached to get the paperwork and check him and put more space between him and guard. I do feel both parties are at fault in some ways for not defusing the situation but I hold Mr. Greene responsible for his actions and taking the first swing at the security guard. His options were not used and he chose violence to address the situation and therefore to remain within company policy I feel I must recommend termination of Mr. Greene. I took into consideration his tenure and his good employee standing and his personal issues and I still cannot justify any other action tha[n] staying within the policy and terminating his employment. I feel that the investigation and interviews by Security and H/R will be defendable even if Mr. Greene request[s] an[] [Appeal Review Committee] appeal.
> If you are in agreement I'd like to communicate the decision to Ronnie

---

this." I replied I going to call my supervisor and the police.
Doc. 41-9 at 26.

Moore no later than February 13, 2013 if not earlier.

Doc. 41-9 at 25; Doc. 42-1 at 10, 12, 32; Doc. 50-1 at 23.

Later that day, McDonald emailed Brennan and Ready (with a copy to Scoggins) summarizing what Greene had told him about the incident. Doc. 41-9 at 28; Doc. 42-1 at 33. McDonald opined, "It is very apparent there was agitation on both sides. Both men used provoking words which inevitably escalated the situation." Doc. 42-1 at 33. McDonald summarized the investigation:

> -Greene was upset because he had to open the gate (again).
> -Greene insulted the guard by questioning him about not doing his job.
> -The guard insulted Greene for telling him it was not his job to do.
> -Situation continued to escalate because no one was willing to simply walk away.
>
> What is evidently clear is that Greene had several outs which he failed to exercise.
>
> 1) Drive away from the terminal and have an Imperial or SAIA rep at the terminal while he unloaded.
> 2) Stayed in his tractor and handed the bills to the guard before starting his process.
> 3) Call the police if he indeed felt threatened or in fear for his life.
> 4) Not question/insult the guard on what his job entails.
> 5) Not engage the guard and walk away.

Doc. 42-1 at 33. He concluded, "I believe both Greene and the guard are at fault and contributed to the incident. It would set a bad precedent to allow Greene to continue employment with SAIA as well as a liability. I concur with Jim Scoggins' opinion in that Greene should be terminated." Doc. 42-1 at 33. A few hours later, Brennan emailed Scoggins (with copies to Ready and McDonald) stating, "After reading your recap, I agree with your recommendation to terminate for violence in the workplace." Doc. 41-9 at 25; Doc. 42-1 at 34.

14

The next morning, on Wednesday, February 13, Scoggins emailed Moore and McDonald (with a copy to himself) stating,

> Ronnie after our conversation last night I know you understand and agree so let's move forward with the termination of Mike Greene today using violence in the workplace as the reason and in the termination comments state he had a physical altercation with the security guard. I hate it cause Mike has always been a non event but allowing conduct like this in the work place is not acceptable in any regard. Wish Mike good luck and even if he resigns we will still use the code resigned in lieu of termination and the same comments. He made a bad decision and I hate it for him.

Doc. 41-9 at 25; Doc. 42-1 at 34. Later that day, Moore told Greene he was fired. Doc. 43-1 at 176. As for Jenkins, McDonald asked Imperial Security to take him off the work site. Doc. 51-1 at 62–63.

SAIA allows employees to appeal a termination decision to an Appeal Review Committee, a "process where an employee who was terminated … can file an appeal, and that appeal is heard by a group of their peers who [can] overturn the termination decision." Doc. 44-1 at 21; *see also* Doc. 41-6 at 19−21 (description of process); Doc. 50-1 at 39–46 (same). The committee is "self-sufficient," but, as SAIA's Vice President of Human Resources, Ready is available to answer any questions the committee has. Doc. 44-1 at 21.

Eight days after the termination decision, Greene requested review by an Appeal Review Committee. Doc. 43-3 at 193, 198−99. In a request form he sent to Ready, he said:

> In closing, I would like to say that this incident occurred because I reported Mr. Jenkins to his supervisor. I never saw it coming. I've been with SAIA for 14 and a half years with no disciplinary action on file. I always get along with everyone. I had the best run, the best insurance,

No. 5 in seniority. My wife is a kidney transplant recipient and [United Healthcare] … was great. So that now I ask you why would I jeopardize my wife's life-saving medicine and my job by starting a fight? I was attacked, plain and simple, and defended myself.

Doc. 43-3 at 199–200.

SAIA provided Greene the names of employees in various positions, and he struck anyone he wanted until he ended up with a five-person Appeal Review Committee. Doc. 43-3 at 194, 196, 206. They convened and, after asking Greene, Scoggins, and McDonald questions, upheld the decision. Doc. 43-3 at 203–205. Greene felt like the process was "rigged" because they asked him questions before he was done with an opening statement, he felt the questions "were off the wall," and he felt like the tone and attitude was, "I'm done." Doc. 43-3 at 241−42.

## II.    Standard

To decide a motion for summary judgment, a court must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Federal Rule of Civil Procedure 56(a) directs a court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A factual dispute will not necessarily preclude summary judgment; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-movant." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

The movant has the initial burden of showing there is no genuine issue of

material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). If the movant satisfies that burden, the non-movant "must then go beyond the pleadings, and by its own [evidence], designate specific facts showing that there is a genuine issue for trial." *Jeffrey v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995) (internal quotation marks omitted).

### III.   Law & Analysis

The ADA prohibits an employer from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). Under the "expense theory" of association disability discrimination asserted by Greene, Doc. 52 at 9, it is unlawful to fire someone because he is associated with a disabled person covered under the employer's healthcare plan. *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 487 (6th Cir. 2011); *Erdman v. Nationwide Ins. Co.,* 582 F.3d 500, 511 n.7 (3d Cir. 2009); *Trujillo v. PacifiCorp,* 524 F.3d 1149, 1155–57 (10th Cir. 2008); *Larimer v. Int'l Bus. Machs. Corp.*, 370 F.3d 698, 700 (7th Cir. 2004).

ERISA § 510 prohibits an employer from interfering with an employee's attainment of any right to which he may become entitled under the plan. 29 U.S.C. § 1140. "This section prohibits interference with present … benefits and also protects against interference with future entitlement to receive the same." *Gitlitz v. Compagnie Nationale Air France*, 129 F.3d 554, 558 (11th Cir. 1997). "The ultimate inquiry in a § 510 case is whether the employer had the specific intent to interfere

with the employee's ERISA rights." *Clark v. Coats & Clark*, 990 F.2d 1217, 1222−23 (11th Cir. 1993). "A plaintiff is not required to prove that interference with ERISA rights was the sole reason for the discharge but must show more than the incidental loss of benefits as a result of a discharge." *Id.*

The FMLA prohibits an employer from retaliating against an employee for exercising FMLA rights. 29 U.S.C. § 2615(a)(1); 29 C.F.R. § 825.220(c); *see Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 798 n.5 (11th Cir. 2000) (statute does not specify "retaliation" but the "substance … is that an employer may not do bad things to an employee who has exercised or attempted to exercise any rights under the statute."). Those rights include a right to "12 workweeks of leave during any 12-month period" to care for a spouse with a serious health condition. 29 U.S.C. § 2612(a)(1)(C).[15]

Without direct evidence of discrimination, interference, or retaliation, as here,[16] Greene's claims for association discrimination under the ADA, interference under ERISA, and retaliation under the FMLA are analyzed using the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802−04

---

[15]ERISA and the FMLA allow both interference and retaliation claims. *See* 29 U.S.C. §§ 1140, 2615(a)(1); 29 C.F.R. § 825.220(c). Although the complaint does not clearly specify the type of ERISA and FMLA claims Greene brings, he does not contend in the response to the summary-judgment motion that he is bringing anything other than an interference claim under ERISA and a retaliation claim under the FMLA. *See generally* Docs. 52, 56.

[16]Direct evidence is evidence that, if believed, proves a fact without inference or presumption. *Morris v. Emory Clinic, Inc.,* 402 F.3d 1076, 1081 (11th Cir. 2005). Greene does not contend there is direct evidence of discrimination or interference, *see generally* Doc. 52, Doc. 56, and the record reveals none.

18

(1973). *See Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001) (ADA); *Gitlitz*, 129 F.3d at 558–59 (ERISA); *Martin v. Brevard Cty. Pub. Schs.*, 543 F.3d 1261, 1268 (11th Cir. 2008) (FMLA). The parties agree. *See generally* Docs. 40, 52, 55, 56.

Under the framework, the employee has the initial burden of establishing a prima facie case. *McDonnell Douglas,* 411 U.S. at 802. "The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons" for the adverse action. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981). "[T]he prima facie case raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Id.* at 254. (internal quotation marks omitted). Its establishment "in effect creates a presumption that the employer unlawfully discriminated against the employee." *Id.* The burden of establishing a prima facie case is not an onerous one. [17] *Id.*

---

[17]To establish a prima facie case of associational disability discrimination under the ADA, a plaintiff must show (1) he suffered an adverse employment action, (2) he was qualified for the job at that time, (3) his employer knew he had a relative with a disability, and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the relative's disability was a determining factor in the employer's decision. *Hilburn v. Murata Elecs. N. Am. Inc.*, 181 F.3d 1220, 1230−31 (11th Cir. 1999). To establish a prima facie case of interference under ERISA, an employee must show he (1) was entitled to ERISA protection, (2) was qualified for the position, and (3) was discharged under circumstances that give rise to an inference of discrimination. *Liebman v. Metropolitan Life Ins. Co.*, 808 F.3d 1294, 1300 (11th Cir. 2015). To establish a prima facie case of retaliation under the FMLA, a plaintiff must show (1) he engaged in statutorily protected conduct, (2) he suffered a materially adverse employment decision, and (3) the action was causally related to the protected conduct. *Schaff v. Smithkline Beecham Corp.*, 602 F. 3d 1236, 1243 (11th Cir. 2010). It is unnecessary

If the employee satisfies his burden of establishing a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged action. *McDonnell Douglas*, 411 U.S. at 802–03. The burden is "one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotation marks omitted).

If the employer satisfies its burden of articulating a legitimate, non-discriminatory reason for the challenged action, the burden shifts back to the employee to establish that the reason was pretext for unlawful action. *McDonnell Douglas*, 411 U.S. at 804. A proffered legitimate, nondiscriminatory reason is not pretext unless it is false and discrimination is the real reason. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

Whether an employer's proffered reason is pretext centers on the employer's beliefs, not the employee's beliefs. *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). "A plaintiff is not allowed to recast [the reason] or substitute his business judgment for that of the employer." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). If the proffered reason is one that would motivate a reasonable employer, the employee "must meet that reason head on and rebut it," not "simply quarrel[] with the wisdom of [the employer's] reason." *Id.*

A plaintiff may show pretext "directly by persuading the court that a

---

to decide if Greene has established prima facie cases for the claims because summary judgment is warranted on another independent basis (insufficient evidence of pretext).

discriminatory reason more likely motivated the employer." *Burdine*, 450 U.S. at 256. If the proffered reason is a work-rule violation, a plaintiff may show pretext with evidence (1) he did not violate the rule, or (2) if he did, the employer treated him differently than others outside the protected class who also violated the rule. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). A plaintiff also may show pretext indirectly by showing that the employer's proffered reason is unworthy of credence. *Burdine*, 450 U.S. at 256. He may do so by identifying "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005).[18]

For each of Greene's claims, SAIA contends he has insufficient evidence to establish a prima facie case and, regardless, he has insufficient evidence to establish its proffered legitimate, non-discriminatory reason for firing him—his workplace fight with Jenkins—is pretext for discriminating against him because of his association with his disabled wife, for interfering with his rights under the healthcare plan, or for retaliating against him for using FMLA leave. *See generally* Docs. 40, 55.

---

[18]Citing *Archie v. Frank Cockrell Body Shop, Inc.*, 581 F. App'x 795 (11th Cir. 2014), SAIA contends, "Where an employee is involved in an altercation at work, his discrimination claims will fail on summary judgment where there is evidence in the record from which a reasonable factfinder could find he was fired for fighting." Doc. 40 at 17–18. As Greene observes, Doc. 56 at 2–3. SAIA's contention is too broad. In *Archie*, the Eleventh Circuit merely held the plaintiff had failed to establish pretext because he had not identified any weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the stated reason for his termination. 581 F. App'x at 799.

For the ADA and ERISA claims, Greene does not dispute that SAIA has proffered a legitimate, non-discriminatory reason for firing him but disputes he has insufficient evidence to establish the prima facie cases and pretext. *See generally* Docs. 52, 56. He does not address the FMLA claim. *See generally* Docs. 52, 56.

I recommend granting summary judgment on each of Greene's claims because, at a minimum, he has failed to offer evidence to allow a reasonable factfinder to find that SAIA's stated reason for firing him—his workplace fight with Jenkins—was pretext for discriminating against him because of his association with his disabled wife, for interfering with his rights under the healthcare plan, or for retaliating against him for using FMLA leave.[19]

The undisputed facts (and disputed facts viewed in Greene's favor) show he was a longtime employee not known to cause trouble. Doc. 49-1 at 4–5; Doc. 50-1 at 5–6. He never had an issue with claims under the healthcare plan or requests for leave to care for his wife. Doc. 43-1 at 71, 75–76, 88, 102; Doc. 43-3 at 257. SAIA has a policy against workplace violence. Doc. 41-5 at 18; Doc. 41-6 at 8. The policy does not mandate termination but SAIA has always fired both sides involved in a physical fight at work.[20] Doc. 44-1 at 24. SAIA fired him after an investigation revealed he had

---

[19]A court may deem abandoned any claim a plaintiff raises in his pleading but fails to address in response to a summary-judgment motion. *Cusick v. Yellowbook, Inc.*, 607 F. App'x 953, 954 n.1 (11th Cir. 2015); *see Washington v. Carter's Retail, Inc.*, No. 3:10-cv-1136-J-32PDB, 2014 WL 6473673, at *8–9 (M.D. Fla. Nov. 18, 2014) (unpublished) (deeming abandoned FMLA claim plaintiff failed to address in response to summary-judgment motion). I additionally recommend deeming Greene's FMLA claim abandoned because he failed to address it in response to the summary-judgment motion. *See generally* Docs. 52, 56.

[20]Although Greene heard rumors that Whitehead was in a fight and was not

hit Jenkins at work. Doc. 43-1 at 147–48, 152; Doc. 47-1 at 59–60; Doc. 49-1 at 15–17; Doc. 50-1 at 62–64; Doc. 51-1 at 31, 46. One person involved (Moore) had told him he had acted in self-defense. Doc. 43-1 at 156, 167–68. Some involved knew his wife has a disability requiring expensive healthcare treatment (Moore and Ready). Doc. 43-1 at 128–31, 179–80; Doc. 44-1 at 25–26. Another involved knew she has or had kidney problems (Scoggins). Doc. 43-1 at 81, 121–23; Doc. 50-1 at 11. At least two involved knew he had taken FMLA leave at least at some point to care for her (Scoggins and Moore). Doc. 43-1 at 69, 80–81; Doc. 49-1 at 30; Doc. 50-1 at 57–59. And all involved (Brennan, McDonald, Moore, Ready, and Scoggins) were eligible for bonuses dependent on SAIA's bottom line affected by healthcare costs. Doc. 44-1 at 28–29; Doc. 49-1 at 34; Doc. 50-1 at 23–24. But he has no evidence that anyone was concerned about SAIA's healthcare costs generally or Mrs. Greene's specifically or his need to take leave to care for her that would allow a reasonable factfinder to find the proffered reason for his termination was pretext for unlawful discrimination, interference, or retaliation.

A reasonable inference of concern might be drawn from evidence those involved had not recommended firing others who had fought at work but who had no association with disabled persons covered under the healthcare plan or who had not used FMLA leave, but he has presented no such evidence.[21] A reasonable inference of

---

fired, Doc. 43-1 at 182–83; *see also* note 11 on page 10, hearsay about Whitehead's past is insufficient to create a genuine issue of material fact concerning SAIA's practice of always firing both people involved in a physical altercation.

[21]Greene contends the "similarly situated" analysis is inapplicable to this case. Doc. 56 at 2. Such evidence is not dispositive but is relevant to establishing pretext.

concern might be drawn from evidence that Mrs. Greene's healthcare costs were substantially higher in 2012 than in 2011 and expected to continue to increase,[22] but he has presented no such evidence, and his own testimony suggests otherwise. Doc. 43-3 at 233–36, 248–49, 274–275. A reasonable inference of concern might be drawn from peculiar timing (evidence those involved learned about her disability, her healthcare costs, or his need for FMLA leave to care for her just before the decision), but he has presented no such evidence, and the evidence shows otherwise (those involved who knew about her medical problems and his need to take FMLA leave to care for her had possessed that knowledge for a long time, and Ready would have received any $20,000 alert for the transplant months before the termination (and could have received others even further back)). Doc. 43-1 at 121–23, 128–31, 178, 181; Doc. 50-1 at 11. A reasonable inference of concern might be drawn from evidence that her healthcare costs affected decisionmakers' bonuses in a tangible and significant way (evidence concerning the number of supervisors in the 8,500-person company, the bonus structure, or unused healthcare funds reverting to funds available for bonuses), but he has presented no such evidence, leaving the Court to merely speculate whether the impact was significant enough to drive a termination decision.

There is evidence Scoggins and, later, the Appeal Review Committee

---

See *Trujillo*, 524 F.3d at 1158–60 (evidence that employer imposed progressive discipline on other employees who committed same offense but immediately terminated plaintiffs was one of several factors contributing to pretext finding).

[22]Greene alleged in the complaint, "Beginning in early 2013, the costs associated with Mrs. Greene's medical care continued to steadily increase," Doc. 1 ¶ 16, but there is no record evidence to support the allegation.

considered Mrs. Greene's disability and her need for company health insurance, but only as a factor against termination. From Scoggins's knowledge of her disability, Doc. 43-1 at 128; Doc. 50-1 at 11, his February 12 email to Brennan explaining, "I took into consideration his tenure and his good employee standing and his personal issues and I still cannot justify any other action," Doc. 41-9 at 25, and his testimony explaining what "personal issues" meant, Doc. 50-1 at 11, 76–77, the Court may reasonably infer he had considered her disability and need for company health insurance, but only as a factor against termination. From Greene's form explaining his wife had undergone a kidney transplant, company health insurance was great, and he would not have jeopardized her "life-saving medicine" by starting a fight, Doc. 43-3 at 200, the Court may reasonably infer the Appeal Review Committee had considered her disability and need for company health insurance at his request, but, again, only as a factor against termination. There is no evidence from which a reasonable inference can be drawn that anyone considered those against him.

As SAIA contends, this Court's opinion in *Corning v. LodgeNet Interactive Corp.*, 896 F. Supp. 2d 1138 (M.D. Fla. 2012), is analogous. Doc. 40 at 21–22. Corning started working for LodgeNet in 1996. *Corning*, 896 F. Supp. 2d at 1142. In 2001, he suffered kidney failure and thus had to undergo dialysis treatments, and, in 2004, he suffered chronic heart failure. *Id.* He alleged employees complained about the impact of his conditions on their insurance premiums and that, during a 2004 review, LodgeNet told him his illness and disability were costing it too much, and so, in 2005 and 2008, he received a lesser raise than other employees. *Id.* at 1142, 1156. In May

2007, he had a kidney transplant. *Id.* at 1142. He alleged that, in December 2007, his supervisor told him his excessive health insurance claims caused an increase in LodgeNet's premiums and that his transplant, hospitalization, and 3-month FMLA leave cost the company a lot of money. *Id.* The same month, following an alleged customer complaint, LodgeNet put him on a performance plan. *Id.* In February 2008, his supervisor showed him new office space, which he alleged was a dusty, moldy storage unit lacking heating, air-conditioning, plumbing, running water, and a toilet. *Id.* He told his supervisor he could not work under those conditions because of his kidney and compromised immune system. *Id.* at 1142−43. Two days later, LodgeNet fired him. *Id.* He alleged he had received "stellar" reviews until a month before the termination, had been improving, and had been on a "positive track." *Id.* at 1156. He sued, asserting claims under state law, the ADA, and § 510 of ERISA. *Id.* at 1143.

   In granting LodgeNet's motion for summary judgment, this Court found insufficient evidence to show LodgeNet's proffered reason for his termination (performance issues including insubordination, a threat to a coworker, at least one customer complaint, and sexual harassment of a coworker) was pretext. *Id.* at 1150–1152, 1154, 1156. For the § 510 claim, this Court found significant that LodgeNet had known about his conditions for years before his termination, coordinated with him to ensure he received medical leave, paid all of his medical claims without incident, and took no action to deprive him of benefits. *Id.* at 1156. This Court observed although there was proximity between the storage-shed incident and his termination, there

was no suggestion his use of benefits increased just prior to his termination.[23] *Id.* So

it is here.

Greene points to asserted inconsistencies in deposition testimony and

---

[23]Compare also *Trujillo*, 524 F.3d at 1155–60 (sufficient evidence of pretext: employer imposed progressive or lesser discipline on similarly situated employees but immediately terminated plaintiffs; employer did not follow its own policy or interview plaintiffs' supervisor during investigation; employer did not give plaintiffs—28-year employees—any benefit of doubt during investigation; plus evidence produced for prima facie case—self-insured employer expressed concern about rising healthcare costs and made many efforts to cut them; employer monitored healthcare costs generally and those of plaintiffs' son specifically; executive commented 90% of all healthcare costs were incurred by just 10% of employees and plaintiffs' son was one of just two beneficiaries with terminal illness; employer began investigating plaintiffs for "time theft"—leading to their termination—only 11 days after son's cancer relapse); and *Dewitt v. Proctor Hosp.*, 517 F.3d 944, 946–48 (7th Cir. 2008) (sufficient direct evidence of discrimination: self-insured employer was having financial trouble and showed obvious concern for cost-cutting; employer tracked employees who incurred more than $25,000 in medical bills; employer pulled plaintiff aside to discuss costs of spouse's cancer treatment; termination occurred five months after conversation with employer and three months after employer warned employees it would implement creative cost-saving measures); with *Cusick v. Yellowbrook, Inc.*, 607 F. App'x 953, 955–56 (11th Cir. 2015) (insufficient evidence of pretext: plaintiff was demoted for deficient leadership skills and acknowledged "disappointments outweigh the accomplishments" in career; no evidence supervisors bore any animus against him or child with disability, knew costs of her medical treatment, or knew if costs increased employer's premium); *Turner v. Humana, Inc.*, 901 F. Supp. 2d 1035, 1042 (S.D. Ohio 2012) (insufficient evidence of pretext: plaintiff disputed meaningfulness of deadlines he missed, importance of tasks he failed to complete, and necessity of technical knowledge he lacked; no evidence that employer fired him to avoid paying for wife's health care); *Somogye v. Toledo Clinic, Inc.*, No. 3:11 CV 496, 2012 WL 2191279, at *10 (N.D. Ohio June 14, 2012) (unpublished) (insufficient evidence of pretext: employee violated confidentiality policy; policy allowed discipline "up to and including termination"; employee did not show similarly situated employees were treated differently); *Lyons v. Core Sys., LLC,* No. 2:10-cv-75, 2011 WL 4402777, at *15 (S.D. Ohio Sept. 21, 2011) (unpublished) (insufficient evidence of pretext: while management's repeated statements about high cost of healthcare at company may be sufficient to shift burden to company to show legitimate reason, they are insufficient to show pretext; associated person had been ill for years and no evidence her condition worsened around time of termination).

"distortions" in the summary-judgment motion to contend there are weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in SAIA's proffered reason for firing him that would allow a reasonable factfinder to find the reason unworthy of credence. Doc. 52 at 1−8, 10−13; Doc. 56 at 1−3. The transcripts, read in their entirety and in context, read without technical meaning to legal terms of art used by counsel, and considered with the undisputed evidence, show otherwise.

Greene contends Roger and Ready contradicted each other concerning Ready's ability to access benefits information. Doc. 52 at 3. It is undisputed that United Healthcare maintains benefits information, and both Roger and Ready testified only Roger and employees in her department have access to United Healthcare's system. Doc. 44-1 at 39−41; Doc. 45-1 at 11. Asked if Ready could obtain access to the system if he asked for and needed it, Roger testified yes. Doc. 45-1 at 11−12. Asked if Roger would send him information about Greene's benefits, Ready testified no "because it's personal health information." Doc. 44-1 at 12−13. Their testimony is not contradictory.

Greene contends "[t]here is also contradictory testimony from various members of SAIA management regarding who made the decision to terminate" and "no one would take responsibility" for the decision. Doc. 52 at 4−5, 10. To the contrary, all testimony accorded with the contemporaneous emails[24] and reflected the involvement

---

[24]*See* McDonald's February 10 email to Scoggins, Ready, and others, with copies to Moore and Whitehead, Doc. 41-9 at 27; Scoggins's February 12 email to Brennan, with copies to Ready, McDonald, and himself, Doc. 41-9 at 25; Doc. 42-1 at 32; McDonald's February 12 email to Brennan and Ready, with a copy to Scoggins, Doc. 42-1 at 33; Brennan's February 12 email to Scoggins, with copies to McDonald

of many, with no single decisionmaker: McDonald, Moore, and Scoggins gathered facts; Scoggins first recommended termination; McDonald agreed termination was appropriate; Brennan agreed termination was appropriate; Moore agreed termination was appropriate; Ready was informed of the incident, the facts, and the recommendations; Ready could have overruled the termination decision and would have decided had the others disagreed; and Ready was available to the Appeal Review Committee to answer any questions. Doc. 42-1 at 20–24, 27–36, 43–44, 47–48, 51–53 (Brennan); Doc. 44-1 at 10–12, 15, 20–21, 35–36 (Ready); Doc. 49-1 at 5, 17–20, 32, 35–36 (Moore); Doc. 50-1 at 7, 9–10, 26, 35–36, 47, 49–52, 75–76, 84–85 (Scoggins); Doc. 51-1 at 7–10, 15, 18–20, 26–28, 49–53, 68, 70–71, 84–85 (McDonald).[25] Without contradiction, Brennan explained, "our investigations are very, very inclusive of many people's thoughts, processes, insights before someone is terminated."[26] Doc. 42-

---

and Ready, Doc. 41-9 at 25; and Scoggins's February 13 email to McDonald and Moore, with a copy to himself, Doc. 41-9 at 25.

[25]SAIA's statement in the summary-judgment motion, "it is undisputed that neither Moore nor Ready made any recommendations or approvals regarding the decision to terminate Plaintiff's employment," Doc. 40 at 15, is not, as Greene contends, Doc. 52 at 11, inconsistent with the record. There is no evidence Moore recommended or approved the termination decision; rather, the undisputed evidence shows he agreed it was appropriate and understood the decision. Doc. 41-9 at 25; Doc. 42-1 at 32, 34; Doc. 49-1 at 5, 18–19, 33.

[26]Brennan could not remember a lot of specifics and therefore expressed discomfort about answering many questions, including about each person's role in the investigation and termination. Doc. 42-1 at 47–48. Asked how many people are "typically" involved in a termination decision, she testified, "[Y]ou could have a supervisor in the decision making, you could have—and then add the Terminal Manager. You could add, then, the Regional Manager. You could add the HR Manager, you could add myself. You could add the VP. It could, you know, go to our attorney for their consultation." Doc. 42-1 at 21. With respect to Greene, she explained she could not say who made the decision—only who had been aware of it. Doc. 42-1 at 30. Although she opined Ready had had a bigger role than she had had,

1 at 21–22; *accord* Doc. 50-1 at 7 (Scoggins).

Greene contends McDonald's, Ready's, and Scoggins's testimony was contradictory on whether "credibility determinations were made regarding this incident." Doc. 52 at 6–7, 11. To the extent their testimony was contradictory, it was not contradictory in a way to allow a reasonable factfinder to find pretext. All who discussed the topic testified the termination decision was based on the facts and circumstances, all pointed to the uncontested fact Greene had hit Jenkins, all testified they believed Greene's acts constituted workplace violence, and none testified the decision hinged on a credibility determination against him.[27] Doc. 42-1 at 31, 33, 44–

she did not explain her opinion or testify about anything he had done that did not accord with his testimony. *Compare* Doc. 42-1 at 20–24, 27–36, 47–48, 51–53 (Brennan), *with* Doc. 44-1 at 10–12, 15, 20–21, 35–36 (Ready).

[27]McDonald testified, "My thought process was … this was an ongoing situation. Mr. Greene had an opportunity to speak with SAIA management in regards to his issues … he was having with a particular guard of which he did not do." Doc. 51-1 at 31. He continued, "Mr. Greene had several outs, if you will, to not engage the guard at the time of the incident. Mr. Greene contributed in escalating situation, Mr. Greene threw the first punch, and Mr. Greene was inconsistent with the statements he gave." Doc. 51-1 at 31. Asked if he had made a "credibility determination" that Jenkins's version was more credible than Greene's version, he responded, "I would say that I found Jenkins to be more credible; however, that he equally had responsibility in the escalation of the situation." Doc. 51-1 at 31.

Ready testified, "What we know is that there was a physical altercation that took place. Mr. Greene … gave the first blow." Doc. 44-1 at 34–35. Asked, "So there was no credibility determination made," he responded, "When we have a physical confrontation, we fire both people involved." Doc. 44-1 at 35. Pressed, "I understand, but it's your testimony today that no credibility determination was made which factored into Greene's termination," he responded, "We reviewed the facts; we made our decision based on the facts." Doc. 44-1 at 35. Pressed further, "it's a simple yes/no question," he testified no. Doc. 44-1 at 35.

Scoggins testified, "We looked at the basic facts and made a determination on what was found during the investigation, and violence in the workplace is never acceptable." Doc. 50-1 at 62. As violence in the workplace, he identified Greene's

45 (Brennan); Doc. 44-1 at 17–20, 22–24, 33–35 (Ready); Doc. 49-1 at 15–18, 22–24,

29–30 (Moore); Doc. 50-1 at 6–9, 12–16, 25, 30–32, 62–66 (Scoggins); Doc. 51-1 at 18–

20, 31–35, 50–51 (McDonald). Relatedly, Greene argues it is "disingenuous for SAIA

to suggest that the security guard's account of the fight carries more weight than that

of a longtime employee whose honesty is undisputed." Doc. 52 at 11. As SAIA

observes, however, the decisionmakers believed him "when he admitted to punching

the security guard in the face twice." Doc. 55 at 6.

Greene contends a statement in the summary-judgment motion and Ready's

testimony contradict the "Violence in the Workplace" policy and Brennan's and

Scoggins's testimony on whether termination is mandated no matter a claimed need

to defend oneself. Doc. 52 at 7, 11. The employee manual and written policy speak for

themselves, providing SAIA is committed to a workplace free from violence, SAIA will

not tolerate acts of violence, any acts of violence will cause disciplinary action up to

and including termination, and fighting at work while on duty may, in SAIA's sole

judgment, warrant summary termination. Doc. 41-5 at 18; Doc. 41-6 at 8. Although

---

admission to twice hitting Jenkins. Doc. 50-1 at 62–63. Asked, "So you-all didn't make
a credibility determination about his story," he responded, "Violence is not accepted,
sir." Doc. 50-1 at 63. Asked again, "Did you-all make a credibility determination based
on his version of events," he responded, "We … looked over all the facts of his side of
the story and the security guard and the police report, and all those were taken into
consideration." Doc. 50-1 at 63. Asked again, "Did you make a credibility
determination," he responded, "No sir. I can't say whether I made a credibility
determination or not." Doc. 50-1 at 63.

Moore testified, "It wasn't a matter of doubting. It was just a matter of taking
a statement." Doc. 49-1 at 15. He recalled that Greene had admitted hitting Jenkins
first in the police report but not in his written statement, and that he had not asked
Greene if Greene had swung first. Doc. 49-1 at 15–17.

the introductory paragraph in the motion goes too far to say "SAIA's numerous policies prohibiting workplace violence inform employees that if they get into a fight at work, they will be terminated," Doc. 40 at 2, the statement of material facts in the motion correctly summarizes the policy, including its use of the word "may." Doc. 40 at 3. All witnesses, including Ready, consistently testified termination decisions are based on the facts and circumstances, an employee may defend himself but not with violence, Greene admitted he used violence, and Greene had other options.[28] Doc. 42-

---

[28]Brennan testified SAIA has zero tolerance for violence but SAIA considers the circumstances of each situation. Doc. 42-1 at 31, 33, 45. She testified an employee could defend himself but added self-defense could be running away. Doc. 42-1 at 50.

McDonald said Greene "[a]bsolutely" had the right to defend himself but refused to speculate on whether, under Greene's version of events, he violated the workplace violence policy and never suggested "self-defense" included physical violence. Doc. 51-1 at 35–36. He testified Greene had several "outs": "He could have called management in prior to arriving at the terminal and had somebody of management inside the terminal when he arrived. He could have called law enforcement. He could have not escalated the situation by questioning the guard's job responsibility. He could have not thrown the first punch. He could have simply walked away. He could have ran. He could have made Ronnie Moore aware of the situation prior to the incident, and we would have taken action." Doc. 51-1 at 39. McDonald clarified, "[O]ne, he could have come to management and said, hey, I have an issue with this guard. We could have acted on that. Two, he—if he was indeed in fear for his safety, as he originally stated and, you know, thought the guard was creepy or thought that there was a potential that something bad could happen, he certainly had several outs instead of engaging the guard and escalating a situation that didn't need to be escalated." Doc. 51-1 at 40–41. When asked what Greene was supposed to do, McDonald replied he could have stayed in his truck, called management to come to the terminal, or walked away from the fight. Doc. 51-1 at 43–44, 49–50.

Moore testified he believed Greene did not have a right to defend himself "because he had the opportunity to flee." Doc. 49-1 at 21–24. He testified that if Greene was "found to be at fault," SAIA's "policy and procedures are very clear." Doc. 49-1 at 18. He testified that he "would think" Greene would still have his job if he had not struck Jenkins and had tried to flee. Doc. 49-1 at 28.

Ready testified SAIA has a "clear-cut rule" anytime "two individuals are

1 at 31, 33, 44–45, 50 (Brennan); Doc. 44-1 at 16–18, 20, 22–25, 30–32, 34–35, 38

(Ready); Doc. 46-1 at 14, 20 (Whitehead); Doc. 49-1 at 15–17, 18, 21–24, 28–32

(Moore); Doc. 50-1 at 6–7, 12–16, 31, 62–67, 78–79 (Scoggins); Doc. 51-1 at 18, 20–21,

31, 35–36, 39–41, 43–44, 46, 49–50, 66 (McDonald).

Greene contends it is improper to automatically accept an employers' proffered

reason for termination just because it could be characterized as a business decision,

and evidence that the termination was "harsh or unreasonable" should be considered

---

fighting" and agreed, "[b]y clear-cut rule you [are] trying to suggest that your
workplace violence policy mandates termination in the event of a fight," with "[n]o
exceptions," but immediately clarified, "Any time in 20 years we've had a situation
come to blows, physical violence, it's always resulted in termination." Doc. 44-1 at 23.
He added an employee may defend himself "[a]s long as they do not exchange a blow,"
and clarified that self-defense could include retreating. Doc. 44-1 at 23–24, 31.

Scoggins said one of SAIA's "cardinal rules" is that "violence in the workplace
is a terminating offense." Doc. 50-1 at 6. When asked if SAIA's rules or policies
required Greene to be terminated, he replied, "[T]hose rules are written with explicit
guidelines" that violence in the workplace will not be tolerated, and "based upon the
facts of the incident, [the policy] would require him to be terminated." Doc. 50-1 at 6–
7. He clarified that "[a]ll decisions are discretionary." Doc. 50-1 at 7. When asked if
Greene had the right to defend himself in this incident, he replied that "there were
options [he] could have taken to avoid the confrontation." Doc. 50-1 at 12–13. He said
Greene could have "evaded the confrontation" by running away, backing away, or
staying in his truck, and there was a "good possibility" he would still have his job if
he had not engaged in violence in the workplace. Doc. 50-1 at 64–66.

Whitehead said, "Violence in the workplace will not be tolerated," and affirmed
that meant anyone involved in a physical altercation would be automatically
terminated, but stated he could not say whether Greene deserved to be terminated
without knowing the details of the incident or being involved in the investigation.
Doc. 46-1 at 14. When asked if the workplace violence policy permitted an SAIA
employee to defend himself, Whitehead responded he understood the policy to mean
simply "no violence in the workplace," and he was not aware of any self-defense
component to it. Doc. 46-1 at 20.

as evidence of pretext. Doc. 52 at 12–13. It is true that justifying an action as a business decision does not insulate it from the pretext analysis. *See Burdine,* 450 U.S. at 259 ("The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to … liability, although this may be probative of whether the employer's reasons are pretexts for discrimination."). But there is a distinction between "a poor business decision and a reason manufactured to avoid liability." *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988). An employee's perception that his employer's action was harsh or unreasonable is not enough; he must produce evidence raising an inference that the proffered reason is untrue. *Compare Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997) (employee's disagreement with decision to hire supervisor with more experience but history of financial impropriety could not show pretext because "such potential disagreement does not, without more, create a basis to *disbelieve* an employer's explanation") (emphasis in original); *with EEOC v. Yenkin-Majestic Paint Corp.*, 112 F.3d 831, 834–35 (6th Cir. 1997) (employer's efforts to label termination as business decision did not insulate it from conclusion that proffered reason was pretext; where employee was allegedly terminated because employer falsely thought she was unqualified, sufficient evidence of pretext included employer's admitted initial decision to give employee false reason for termination, likelihood that supervisor knew duties she performed, and lack of some other legitimate or illegitimate reason for action).

Greene has presented no such evidence. He agrees his fight with Jenkins

justified discipline but disagrees it justified termination, questioning, "Why didn't they give me a break? Why couldn't they have done something else[?]" Doc. 43-1 at 161, 168; Doc. 43-3 at 237, 255–56. He suggests that, due to his "perfect driving record" and "perfect employee record," SAIA should have overlooked the incident. Doc. 43-3 at 237. But his disagreement with SAIA's business decision, without evidence to show SAIA did not terminate him for fighting, does not establish pretext. The undisputed evidence shows the termination was not unreasonably harsh in light of SAIA's consistent termination of employees who engage in workplace violence and the refusal of the Appeal Review Committee—made up of peers Greene selected—to overturn the decision. Doc. 43-3 at 196, 205–06, 208; Doc. 44-1 at 21, 23–24, 35; Doc. 46-1 at 14–16; Doc. 49-1 at 37–38; Doc. 50-1 at 8–9, 34–35, 38, 39, 45–46, 69–70. And he presents no evidence that SAIA's decision was baseless; the undisputed evidence shows SAIA investigated and analyzed the facts before reaching a unanimous decision. Doc. 42-1 at 27–28, 34–36, 41, 52–53; Doc. 44-1 at 10–11, 35; Doc. 49-1 at 5, 17–19, 29; Doc. 50-1 at 6–10, 14–15, 49–50; Doc. 51-1 at 62–66. Without evidence showing the proffered reason was false, Greene's argument fails.

In short, summary judgment is warranted because, at a minimum, Greene has insufficient evidence from which a reasonable factfinder could find the proffered reason for his termination—his workplace fight with Jenkins—was pretext for discrimination against him because of his association with his disabled wife, for interference with his right to obtain benefits under the healthcare plan, or for

retaliation for having taken leave to care for her.[29]

## IV.    Recommendation

I recommend:

(1)    **Granting** SAIA's motion for summary judgment, Doc. 40; and

(2)    **Directing** the Clerk of Court to enter final judgment in favor of SAIA and against Greene and then close the case.[30]

**Entered** in Jacksonville, Florida, on February 9, 2016.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:    Counsel of Record

---

[29]"[E]stablishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary-judgment motion in an employment discrimination case." *Smith v. Lockheed Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's [unlawful] intent." *Id.* "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal quotation marks omitted). Greene's claims fail under this standard for substantially the same reasons that his claims fail under the pretext standard.

[30]"Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.